THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: March 4, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*University of Kentucky*
*v.*
*40-0, LLC*
_____

Opposition No. 91224310
_____

Michael S. Hargis and Trevor T. Graves of King & Schickli, PLLC,
    for University of Kentucky.

Brian P. McGraw of Middleton Reutlinger,
    for 40-0, LLC.

_____

Before Bergsman, Heasley, and Pologeorgis,
    Administrative Trademark Judges.

Opinion by Heasley, Administrative Trademark Judge:

Opposer, the University of Kentucky, opposes Applicant 40-0 LLC's application to register the standard character mark **40-0** on the Principal Register for T-shirts and other sports-related apparel in International Class 25, primarily on the ground that "**40-0**" fails to function as a trademark.

## I.    Background

### A. Factual Background

In mid-October 2013, John Calipari, the head coach for the University of Kentucky's men's basketball team, publicly announced his desire "to coach a team that goes 40-0"—a perfect record in the National Collegiate Athletic Association Division I.[1] His announcement, carried in the media, echoed the desire of University of Kentucky players and fans for an undefeated season.[2]

That same month, David Son, an attorney and a self-proclaimed fan of Opposer's men's basketball team, formed Applicant, a Kentucky limited liability company, of which he is the sole member.[3] Applicant began creating, promoting, and selling T-shirts bearing the legend "**40-0**" in October 2013, initially distributing and selling the T-shirts at University of Kentucky men's basketball viewing parties, and then marketing and promoting them through its website, 40and0.com, its Facebook page, and through in-person promotions.[4] The next month, November 2013, Mr. Son contacted the University of Kentucky athletics director, informed him that he had created the "**40-0**" T-shirts, and said he was interested in working with the University's athletic department in promoting and marketing the T-shirts.[5] This overture did not result in a business relationship, and the parties had no further

---

[1] Stipulated facts 4, 13, 57 TTABVUE 9, 11; Opposer's brief, 63 TTABVUE 9.

[2] Stipulated fact 11, 57 TTABVUE 10.

[3] Stipulated facts 46-49, 57 TTABVUE 15.

[4] Stipulated facts 45, 52-59, 57 TTABVUE 14-16; Applicant's brief, 67 TTABVUE 7.

[5] Stipulated facts 5-6, 57 TTABVUE 10; Applicant's brief, 67 TTABVUE 8.

discussions until early 2015.[6]

On February 13, 2015, Applicant applied to register the mark **40-0** (in standard characters) on the Principal Register for "clothing, namely, T-shirts, sport shirts, shorts, sweatshirts, mufflers, hats, jackets, athletic jerseys, sweatpants, cloth bibs, shoes, scarves, bandanas, wrist-bands and socks" in International Class 25.[7] About a month later, Opposer's counsel sent Applicant's counsel a cease and desist letter claiming that Applicant's use of the term "**40-0**" in combination with the University's blue and white color scheme violated its rights under the Trademark Act.[8] The letter asked Applicant to abandon the involved application, and stated, in pertinent part:

> Finally, with regard to your client's stated threat to interfere with the University's possible use of the term "40-0," the University and approved entities have every right to reference the record of the University's men's basketball team on merchandise bearing University marks. In the event the University's basketball team completes the 2014-15 season undefeated, which would necessarily result in a ninth national title, sales of merchandise bearing University marks and referencing their 40-0 record would be significant.[9]

Applicant did not abandon the application, and this opposition proceeding followed.

### B. Procedural Background

Opposer's Notice of Opposition, as amended, claims in three counts:

(1) **Failure to Function**— The applied-for mark, **40-0**, refers solely to a record

---

[6] Applicant's brief, 67 TTABVUE 9.

[7] Application Serial No. 86534269 was filed under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based upon Applicant's claim of first use anywhere and use in commerce since at least as early as October 24, 2013.

[8] Correspondence of March 27, 2015, 66 TTABVUE 64-67.

[9] *Id*. 66 TTABVUE 66.

of an NCAA basketball team that wins each and every game played in a single season. So the term does not function as a trademark to indicate the source of the clothing and to identify and distinguish Applicant's clothing from others. 15 U.S.C. §§ 1051-1052, 1127.[10]

(2) **Fraud**—When Applicant filed the involved application, it had only used the applied-for **40-0** mark in commerce on T-shirts, not on the other goods identified in the use-based application. So Applicant committed fraud on the USPTO by knowingly and falsely asserting that it had used the applied-for mark in commerce on all of the goods identified in the use-based application.[11]

(3) **Nonuse**—Registration should be denied for all goods identified in the involved application on which Applicant failed to use the applied-for mark as of the date it filed the use-based application.[12] 15 U.S.C. § 1051(a).

Applicant's Answer denied the salient claims in the Notice of Opposition, although it admitted that "it sold t-shirts under the applied-for-mark as of the filing of the application and that it did not and does not sell sport shirts, sweatshirts, jackets, socks, shorts, mufflers, athletic jerseys, sweatpants, cloth bibs, shoes, scarves, bandanas, and wrist bands as of the filing date of the '269 Application."[13]

---

[10] First amended notice of opposition ¶¶ 36-37, 18 TTABVUE 13-14.

[11] *Id.* at ¶¶ 40-45, 18 TTABVUE 14-15.

[12] *Id.* at ¶¶ 46-48, 18 TTABVUE 15.

[13] Answer to first amended notice of opposition, ¶ 40, 22 TTABVUE 7. Applicant also asserted the affirmative defenses of unclean hands, laches, estoppel and/or acquiescence, 22 TTABVUE 9, but did not pursue them at trial or in its final brief, so they are waived or forfeited. *See TPI Holdings, Inc. v. TrailerTrader.com LLC,* 126 USPQ2d 1409, 1413 n.28 (TTAB 2018) ("Respondent also asserted 'estoppel, acquiescence and waiver,' but does not argue any of these in its brief. They are therefore waived.").

Applicant later moved to amend the application to delete from its identification of goods all clothing items aside from T-shirts. Applicant made its motion without Opposer's consent, and in a concurrently filed motion for summary judgment, stated that if the motion to amend were granted it would accept "judgment against it with respect to <u>only</u> those goods that it has proposed to delete." (emphasis in original).[14]

Opposer then filed a response and a cross-motion for summary judgment as to all three counts in the amended notice of opposition. Applicant disputed Opposer's claims, and averred in particular that "[b]ecause the 40-0 Mark was used in connection with at least one of the goods listed in the application at the time of filing the application, the '269 Application cannot be found void ab initio…. Applicant began selling T-shirts under the mark in October, 2013 and continued to sell and offer for sale those 40-0 marked T-shirts since that time. … As a result, there is no basis for a non-use claim with respect to Applicant's T-shirts."[15]

Opposer responded, in pertinent part:

> Given Applicant's failure to (1) initiate use of the alleged mark on any of the listed goods except T-shirts prior to filing its use-based application or (2) amend the '269 Application prior to commencement of the present proceeding, judgment against Applicant as to those goods would seem appropriate.

> With regard to Applicant's motion for judgment with regard to T-shirts, Opposer concedes that the evidence of record indicates that Applicant

---

[14] Applicant's motion for leave to amend application without consent, 32 TTABVUE; Applicant's motion for summary judgment, 33 TTABVUE 14.

[15] Applicant's motion for summary judgment, 33 TTABVUE 15. *See also* Applicant's reply in support of motion for summary judgment. 37 TTABVUE.

distributed T-shirts with the phrase 40-0 printed across the front thereof prior to the filing date of the '269 Application.[16]

Opposer also pressed its claims of fraud and failure to function.

The Board denied both parties' motions for summary judgment, and deferred ruling on Applicant's motion to delete goods from its identification until final decision.[17]

The parties then stipulated to Accelerated Case Resolution ("ACR"), an expedited means of resolving inter partes cases. *See generally* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) §§ 528.05(a)(2), 702.04 (2020).[18] The Board noted and approved the parties' ACR stipulation, under which the Board may resolve and decide any genuine dispute of material fact it may find to exist based on the record, and render a final decision based on the record and briefs.[19]

## II. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the subject application. The parties stipulated to 72 facts, and to the admissibility of various categories of evidence that may be presented at trial, including deposition testimony, trial declarations, all documents produced during discovery, all exhibits to the parties' summary judgment briefing, the affidavit

---

[16] Opposer's response to motion for summary judgment and cross-motion for summary judgment. 35 TTABVUE. *See also* Opposer's reply in support of its cross-motion for summary judgment. 38 TTABVUE.

[17] Order, 39 TTABVUE.

[18] ACR stipulation, 57 TTABVUE 19. Under the summary judgment ACR format, the parties agreed to file their joint stipulated facts at least one month before the deadline for Opposer's main brief. Each party also agreed to file any additional evidence five days before filing its brief, so that the brief could cite to the evidence by TTABVUE docket and page numbers.

[19] Order, 58 TTABVUE 2.

of David Son, the sole member of Applicant, submitted in support of Applicant's cross-motion for summary judgment, Applicant's website and posts on Facebook and Twitter, and all documents identified and exchanged by the parties prior to submitting the stipulation to the Board.[20] Stipulations of this sort do much to facilitate the just, speedy, and inexpensive determination of the proceeding, *see* Fed. R. Civ. P. 1, and the parties are commended for their cooperation.

In addition, in accordance with the approved stipulation, the parties introduced the following evidence prior to their respective briefs:

A. **Opposer's Evidence:**[21] First notice of reliance, identifying Opposer's Registration No. 2843073 for BIG BLUE NATION for team loyalty T-shirts, polo shirts, jackets and sweat shirts in Class 25, with Trademark Status and Document Retrieval (TSDR) database printout showing status and title;[22] Second notice of reliance, containing the discovery deposition testimony of David Son, sole member of Applicant, and exhibits, and the discovery deposition testimony of Jason Schlafer, Rule 30(b)(6) witness for Opposer, and exhibits;[23] Third notice of reliance, containing documents produced during discovery, exhibits to the parties' cross-motions for summary judgment, pleadings, all posts on Applicant's Facebook and Twitter pages, Applicant's website screenshots, and all documents, including emails between Opposer and Applicant, identified and exchanged by the parties prior to the submission of their stipulation; [24] Fourth notice of reliance, containing newspaper article exhibit to Opposer's response to summary judgment and cross-motion for summary judgment.[25]

B. **Applicant's Evidence:** First notice of reliance, containing the discovery deposition testimony of David Son as Applicant's Rule 30(b)(6) witness, the discovery deposition testimony of Jason Schafler, Opposer's Rule 30(b)(6) witness;[26] Second notice of reliance, containing documents produced during

---

[20] Stipulation, 57 TTABVUE 9-18.

[21] Summarized at 59 TTABVUE.

[22] 60 TTABVUE.

[23] 61 TTABVUE.

[24] 62 TTABVUE.

[25] 69 TTABVUE.

[26] 65 TTABVUE.

discovery, exhibits to the parties' cross-motions for summary judgment, pleadings, Applicant's Facebook page, Applicant's website, and all documents identified and exchanged prior to the submission of the parties' stipulation.

## III.  Entitlement to a Statutory Cause of Action

Applicant challenges Opposer's standing to bring and maintain this opposition proceeding. We now refer to standing as entitlement to a statutory cause of action. *Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, at *5 n. 34 (TTAB 2020); *Major League Soccer, LLC v. F.C. Int'l Milano S.p.A.*, 2020 USPQ2d 11488, at *5 n. 18 (TTAB 2020). Despite the change in nomenclature, our prior decisions and those of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") interpreting Sections 13 and 14 remain equally applicable. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *4 (Fed. Cir. 2020). As the Court of Appeals for the Federal Circuit has observed, there is "no meaningful, substantive difference between the analytical frameworks" in the prior "standing" case law, under which an opposer must show a real interest in the proceeding and a reasonable basis for its belief in damage, *see Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014), and the current "entitlement" case law, under which an opposer must show an interest falling within the zone of interests protected by statute and damage proximately caused by registration. *Corcamore v. SFM*, 2020 USPQ2d 11277, at *4. Thus, "a party that demonstrates a real interest in [opposing registration of] … a trademark under [Trademark Act Section 13, 15 U.S.C.] § 106[3] has demonstrated an interest falling within the zone of interests protected by [the Trademark Act]. … Similarly, a party that demonstrates a reasonable belief of damage by the registration of a trademark demonstrates

proximate causation within the context of § 106[3]." *Id.* at *7.

The starting point for determining a party's entitlement to oppose is Section 13 of the Trademark Act, providing that "[a]ny person who believes that he would be damaged by the registration of a mark upon the Principal Register" may file an opposition. *See* 15 U.S.C. § 1063.

Opposer believes it would be damaged by Applicant's registration of "**40-0**" for T-shirts on the Principal Register because the registration would impair Opposer's right to use the term on its team loyalty T-shirts—indicating an undefeated basketball season or the team's aspiration to achieve one.[27]

Applicant argues that Opposer has not demonstrated a real interest in using "**40-0**" or a reasonable belief that it would be damaged by Applicant's registration of the term. First, it argues, Opposer has no proprietary or other interest in "**40-0**":

> Opposer admittedly does not own trademark rights to the term 40-0. … [W]hat is lacking here is any real evidence that Opposer has ever used the term 40-0, or that it would otherwise ever use the term 40-0 [ex]cept in the unlikely scenario that its men's or women's basketball team were to complete an undefeated season with a perfect record of 40-0.[28]

In fact, it is stipulated that:

> Men's collegiate basketball governed by the National Collegiate Athletic Association ("NCAA") has been in existence as a sport since 1939. Since that time, not a single team has finished the season with a final record of 40 wins and 0 losses.[29]

Second, Applicant argues, the parties are not competitors:

> Opposer is an institution of higher learning. The Applicant is a single member LLC that prints and sells t-shirts through a website. Practically

---

[27] Opposer's brief, 63 TTABVUE 8-11, Opposer's reply brief, 70 TTABVUE 3-6.

[28] Applicant's brief, 67 TTABVUE 12.

[29] Stipulated fact 67, 57 TTABVUE 17.

speaking these parties are not competitors in any real sense. Not even remotely. Opposer does not manufacture and sell apparel. All it does is license its intellectual property rights to third parties who ultimately sell ancillary products featuring that intellectual property.[30]

Third, it argues, even if Opposer used "**40-0**" on its T-shirts, it need not fear an infringement action from Applicant. During his deposition, Mr. Son testified:

A. Well, if UK has its logo on it, I would imagine my first — my first thought would be the University of Kentucky. … Because I didn't make it. And then I would be thinking that they're using my mark. … And that I would think that we would have to have a conversation.[31]

In its brief, however, Applicant downplays this testimony, stating:

All this statement shows is that Applicant's owner would be thinking he owns rights to the term "40-0", nothing more.
…
Opposer's fear of facing an infringement suit is belied by the fact that two women's basketball teams finished with a record of 40-0, used the term "40-0" on t-shirts to describe the record of its team … and Applicant never once objected to their use.[32]

We find Applicant's arguments unavailing, and that Opposer is entitled to bring and maintain this opposition proceeding under the Trademark Act. Even though this is a threshold issue, *Int'l Dairy Foods Ass'n v. Interprofession du Gruyère and Syndicat Interprofessionnel du Gruyère*, 2020 USPQ2d 10892, at *9 (TTAB 2020), it is "a low threshold, intended only to ensure that the plaintiff has a real interest in the matter, and is not a mere intermeddler." *Syngenta Crop Protection Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1117 n.8 (TTAB 2009) (citing *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999)).

---

[30] Applicant's brief, 67 TTABVUE 11-12.

[31] Son deposition, 96:5-18 (questions omitted), 61 TTABVUE 28.

[32] Applicant's brief, 67 TTABVUE 13-14.

Opposer does not have to assert a proprietary interest in "**40-0**." "An absence of proprietary rights does not in itself negate an interest in the proceeding or a reasonable belief of damage." *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at \*1 (Fed. Cir. 2020). Opposer may prove its entitlement by establishing that it has a present or prospective interest in using the term in its business. *Cf. De Walt, Inc. v. Magna Power Tool Corp.*, 289 F.2d 656, 129 USPQ 275, 280 (CCPA 1961) (Standing "will be presumed or inferred when . . . the opposer or petitioner is one who has a sufficient interest in using the descriptive term in its business.").

Here, it is stipulated that "The University of Kentucky sells and licenses clothing and apparel."[33] It even owns a Principal Register registration for the mark BIG BLUE NATION for use on "team loyalty T-shirts, polo shirts, jackets and sweat shirts" in International Class 25.[34] Its executive associate athletics director, Jason Schlafer, testified as its Rule 30(b)(6) witness about its interest in using "**40-0**":

> [T]he University of Kentucky, should be able to market products bearing its trademarks and other indicia indicating the University as its source. 40-0 is the goal for a perfect … men's or women's basketball season…. Prior to each basketball season, that is the goal of the men's basketball program at Kentucky, and we have come close to achieving that goal historically and believe that we should be permitted to use that phrase as part of a licensed product.[35]

Opposer had, for example, licensed T-shirts bearing its UK mark displaying successful 16-0, 31-0, and 34-0 seasons:

---

[33] Stipulated fact 2, 57 TTABVUE 9.

[34] Reg. No. 2843073, 60 TTABVUE 5.

[35] Schlafer dep. 9:16-10:11, 61 TTABVUE 74-75.



11

DEFENDANT'S EXHIBIT 5[36]

The witness was asked:

    Q. Going back to what we marked as Exhibit 5. It looks like there are three shirts depicted in this exhibit. Do you know if these three shirts were offered for sale by the University?
    A. These all appear to be products that were sold at retail.[37]

    Q. Can you imagine the University offering for sale products with the term "40-0" in a situation other than if the University men's or women's basketball team went 40 and 0?

---

[36] 61 TTABVUE 107. Stipulated fact 43: "The University of Kentucky commemorated its undefeated Southeastern Conference record of 16-0 and noted its accomplishments of completing its undefeated 2014-15 pre-tournament record of 31-0 and its post-SEC tournament record of 34-0." 57 TTABVUE 14.

[37] Schlafer dep. 41:11-16, 61 TTABVUE 95.

> ...
> A.  Well, similar to the garment that we discussed previously, the — there's an aspirational use, as well as a historic one....[38]
> However, I don't think that is an unreasonable goal considering the following season they finished 38-1.[39]

The parties stipulate that "To the extent there has been any use of the term '40-0' by Opposer, such use was aspirational in nature pointing to the event either the men's or women's basketball teams at the University of Kentucky were in a position to achieve a record of 40 wins and 0 losses."[40] Opposer's witness confirms that "[t]here have been T-shirts created by licensees indicating the University's quest for the perfect season bearing registered trademarks and the goal of the perfect record."[41] This quest is not unattainable; two women's basketball teams, Baylor and University of Connecticut, have had perfect 40-0 seasons, and both had "40 and 0" perfect record T-shirts.[42]

Accordingly, we find Opposer has a present or prospective interest in using the term "40-0" on T-shirts and other apparel to indicate its aspiration or achievement of an undefeated season, either in men's or women's basketball.

It is true that Opposer licenses others to produce and sell team loyalty apparel bearing its marks. But the licensees' use of its marks inures to the benefit of Opposer. *See Sock It To Me, Inc. v. Aiping Fan*, 2020 USPQ2d 10611, at *3-4 (TTAB 2020). And Opposer clearly has an interest in the informational matter it places on fan loyalty

---

[38] *Id.* at 37:18-38:1, 61 TTABVUE 93-94.

[39] *Id.* at. 47:8-10, 61 TTABVUE 99.

[40] Stipulated fact 68, 57 TTABVUE 17.

[41] Schlafer dep. 22:21-23:4, 61 TTABVUE 80-81.

[42] Stipulated facts 69, 71, 57 TTABVUE 17-18; Schlafer dep. 29:2-3, 61 TTABVUE 87.

apparel bearing its trademarks. For example, the following image shows University of Kentucky basketball players wearing T-shirts that bear its trademarks, commemorate its undefeated 31-0 regular season record, and add, notably, "NOT DONE":



43

So even though Opposer is an institution of higher learning, it has a direct commercial interest in licensing and selling apparel products. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) *cited in Int'l Dairy Foods Ass'n v. Interprofession du Gruyère*, 2020 USPQ2d 10892, at *9 (belief in likely damage can be shown by establishing a direct commercial interest). Regardless of whether Opposer and Applicant are direct competitors, Opposer has a reasonable

---

[43] March 7, 2015 Bleacher Report article, 69 TTABVUE 6.

basis for its belief in damage resulting from Applicant's registration of "**40-0**", and a real interest in this case. Thus, Opposer has shown that it has an interest in preventing registration within the zone of interests protected by the statute and that it has a reasonable basis for its belief that registration would proximately cause damage to that interest.

Applicant makes much of its forbearance from instituting trademark infringement actions, emphasizing that it has not objected to Baylor University's or the University of Connecticut's use of "40-0" to describe their women's basketball team records.[44] That forbearance, however, misses the point, as registration would accord Applicant rights it does not presently have, as explained more fully below.

Granting Applicant a Principal Register registration for "40-0" would accord it the presumptions afforded under Section 7(b) of the Trademark Act. That section provides that registration on the Principal Register is prima facie evidence of the registrant's "exclusive right to use the mark in commerce on or in connection with the goods…." 15 U.S.C. § 1057(b). "To put [Applicant] in possession of a right it does not have, which it might at any time decide to assert…, would, in our opinion, be damaging… since it could at least be used to harass [Opposer] into ceasing use of [the term] on pain of defending a lawsuit." *De Walt v. Magna Power Tool*, 129 USPQ at 280.

The Board echoed this language in descriptiveness cases:

> The rationale behind these cases involving damage from the registration of merely descriptive terms lies in the presumptions afforded a registration under Section 7(b) of the Statute. That section provides that registration on the Principal Register is prima facie evidence of the registrant's

---

[44] Stipulated facts 70, 72; Applicant's brief, 67 TTABVUE 13-14.

"exclusive right to use the mark in commerce in connection with the goods". Implicit in the "exclusive right" to use is the right "to exclude" others. Thus, a registration of a merely descriptive term would be inimical to the right of others in the trade engaged in the sale of the same or similar goods to use the notation as a word of art in describing their goods and would bestow upon the applicant a competitive advantage to the extent that purchasers may be deceived or misled into believing goods so marketed are the only ones of that type available in the marketplace. This constitutes damage within the intent and meaning of Section 13.

*Southwire Co. v. Kaiser Aluminum & Chem. Corp.*, 196 USPQ 566, 572-73 (TTAB 1977).

So too here. Applicant's assumption of the exclusive right to use "**40-0**" to the exclusion of others would, despite its avowed forbearance, constitute damage within the meaning of Section 13. Opposer has demonstrated, by a preponderance of the evidence, that it is entitled to oppose the registration of Applicant's mark.

## IV. Motion to Amend Application

As noted, Opposer's amended notice of opposition claims that when Applicant filed the subject application for **40-0** based on actual use under Section 1(a), it had used the applied-for mark only on T-shirts, not on the other clothing items identified in the application. Opposer claims that registration should be denied for all the goods on which Applicant failed to use the applied-for mark in commerce when it filed the use-based application. [45] Applicant admits that it had only used **40-0** on T-shirts as of its filing date.[46]

"In a use-based application filed under Trademark Act Section 1(a), 15 U.S.C. 1051(a), registration is allowed only as to goods upon which the mark is being used

---

[45] First amended notice of opposition ¶¶ 40, 48, 18 TTABVUE 14-15.

[46] Answer to first amended notice of opposition, ¶ 40, 22 TTABVUE 7.

as of the application filing date, and an opposition will be sustained as to any of the identified goods as to which it is shown that no use has been made as of the application filing date." *Barbara's Bakery, Inc. v. Landesman*, 82 USPQ2d 1283, 1289 (TTAB 2007). "In the absence of a fraud claim, … as long as the mark was used on some of the identified goods as of the filing of the application, the application is not void in its entirety." *Grand Canyon W. Ranch, LLC, v. Hualapai Tribe*, 78 USPQ2d 1696, 1697 (TTAB 2006) (opposer had not pleaded fraud, and did not seek summary judgment on that basis). The application may be amended to delete those goods on which no use was made. *Id*. at 1698.

Applicant accordingly moved to amend its application to delete all goods except T-shirts from its identification.[47] It further agreed to accept judgment against it as to those deleted goods.[48] Applicant notes that this is the same relief Opposer could have obtained had it prevailed on its claim of non-use.[49]

Opposer responds that "[g]iven Applicant's failure to (1) initiate use of the alleged mark on any of the listed goods except t-shirts prior to filing its use-based application or (2) amend the '269 Application prior to commencement of the present proceeding, Applicant's requested judgment against itself as to those goods should be entered with prejudice."[50]

---

[47] 32 TTABVUE 4.

[48] 33 TTABVUE 14.

[49] 32 TTABVUE 4.

[50] Opposer's brief, 63 TTABVUE 11. *See also* Opposer's response to motion for summary judgment, 35 TTABVUE 9-10.

The amendment of an application that is the subject of an opposition proceeding is governed by Trademark Rule 2.133(a), 37 C.F.R. § 2.133(a):

> An application subject to an opposition may not be amended in substance nor may a registration subject to a cancellation be amended or disclaimed in part, except with the consent of the other party or parties and the approval of the Trademark Trial and Appeal Board, or upon motion granted by the Board.

Under its terms, the Board may, at its discretion, grant the motion even if the opposer does not consent. *City of London Distillery, Ltd. v. Hayman Grp. Ltd.*, 2020 USPQ2d 11487, at \*12 (TTAB 2020) (citing *Drive Trademark Holdings LLC v. Inofin*, 83 USPQ2d 1433, 1435 (TTAB 2007)). *See* TBMP §§ 514.01, 514.03. As the Board has observed:

> An acceptable amendment to the identification of goods or services may be permitted, even where an opposer objects, if: 1) the proposed amendment serves to limit the broader identification of goods or services; 2) applicant consents to the entry of judgment with respect to the broader identification of goods or services present at publication; 3) the specimens of record support the goods or services as amended; and 4) if the applicant wishes to avoid the possibility of a res judicata effect by the entry of judgment on the original identification, the applicant must make a prima facie showing that the proposed amendment serves to change the nature and character of the goods or services or restrict their channels of trade and customers so as to introduce a substantially different issue for trial.

*Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 2020 USPQ2d 10914, at \*5 (TTAB 2020).

Applicant acknowledges these four factors.[51] We find that the amendment limits the broader identification of goods, and that the specimens display Applicant's use of 40-0 on the remaining identified goods: T-shirts. The amendment also presents a

---

[51] 32 TTABVUE 3.

substantially different issue for trial solely as to Opposer's third claim, as it resolves the issue of nonuse.[52] Applicant's motion to amend is granted, and judgment is entered against Applicant as to the deleted goods on Opposer's nonuse claim. *See Grand Canyon W. Ranch v. Hualapai Tribe*, 78 USPQ2d at 1697-98.

## V.    Fraud

Even though Applicant's motion to amend has been granted, that does not avoid Opposer's fraud claim. Fraud as to any goods in a single class renders the application void as to all goods in that class; so fraud based on nonuse cannot be cured by deleting some goods from a class. *Meckatzer Lowenbrau Benedikt Weiß KG v. White Gold, LLC*, 95 USPQ2d 1185, 1188 (TTAB 2010); *G&W Labs. Inc. v. GW Pharma Ltd.*, 89 USPQ2d 1571, 1573 (TTAB 2009). Therefore, we consider Opposer's claim that Applicant committed fraud by filing an application falsely alleging actual use of the applied-for mark on Class 25 apparel other than T-shirts.

"Fraud in procuring a trademark registration occurs when an applicant for registration knowingly makes a false, material representation of fact in connection with an application to register with the intent of obtaining a registration to which it is otherwise not entitled." *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1501 (TTAB 2017) (citing *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938, 1941 (Fed. Cir. 2009)). A party alleging fraud in the procurement of a registration bears the heavy burden of proving fraud with clear and convincing evidence. *Id.*; *Nationstar Mortg. LLC v. Ahmad*, 112 USPQ2d 1361, 1365 (TTAB

---

[52] The amendment does not, however, present a substantially different issue for trial as to the other two claims—fraud and failure to function. As explained more fully below, our decision on those claims applies to all of the apparel items Applicant originally identified.

2014). "There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Bose*, 91 USPQ2d at 1939 (quoting *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981)). To carry this burden, the party alleging fraud must prove that:

(1) the applicant made a false representation to the USPTO;

(2) the false representation was material to the registrability of the mark;

(3) the applicant had knowledge of the falsity of the representation; and

(4) the applicant made the representation with intent to deceive the USPTO.

*See Bose*, 91 USPQ2d at 1941, *cited in ShutEmDown Sports, Inc. v. Lacy*, 102 USPQ2d 1036, 1044 (TTAB 2012).

In this case, it is clear that Applicant made a false representation of use, which was material as to the identified apparel goods that were not in use at the time of filing. *Nationstar v. Ahmad*, 112 USPQ2d at 1365 ("An applicant's statements as to its use of a mark for particular goods and services are unquestionably material to registrability."). The determinative issue is whether Applicant made the representation knowingly, with intent to deceive the USPTO.

Opposer claims that:

41. Applicant, through counsel, made knowingly false and misleading statements in its initial declaration by alleging use of the mark in commerce on or in connection with the goods in the application with an intent to induce the USPTO to grant a registration for the alleged mark for such goods.

42. Applicant knew or should have known that its claim of use of the mark in commerce on or in connection with all of the goods set forth in the '269 application was false.[53]

---

[53] First amended notice of opposition ¶¶ 41-42, 18 TTABVUE 14.

In support of this claim, Opposer states that "Applicant is a graduate of Harvard University and a lawyer, which should raise the expectation of this Board as to the genuineness of Applicant's claim of ignorance of the law."[54] This is based on the stipulated fact that "Applicant's sole member, Mr. David Son, obtained an undergraduate degree from Harvard and a law degree from the University of Louisville. Mr. Son is a practicing attorney who practices in the area of personal injury law."[55]

"Even more," Opposer argues, "Applicant sought the services of a firm that holds itself out as a provider of intellectual property services. … Applicant's deposition testimony suggests that Applicant's intellectual property counsel signed the declaration on Applicant's behalf with full knowledge that the mark had not been used on any goods but t-shirts."[56] Opposer concludes: "[i]n short, there was no good faith reasonable basis for believing that the alleged mark **40-0** was in use in commerce for any of the fifteen goods identified in the application other than t-shirts."[57]

We find that Opposer's evidence falls short of proving knowing intent to deceive. "The standard for finding intent to deceive is stricter than the standard for negligence or gross negligence, and evidence of deceptive intent must be clear and convincing." *Milwaukee Elec. Tool Corp. v. Freud Am., Inc.*, 2019 USPQ2d 460354, at *27 (TTAB 2019) (also citing *Bose*). "Indeed, '[t]here is no fraud if a false misrepresentation is

---

[54] Opposer's brief, 63 TTABVUE 23.

[55] Stipulated fact 46, 57 TTABVUE 15.

[56] Opposer's brief, 63 TTABVUE 23.

[57] Opposer's brief, 63 TTABVUE 24.

occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive.'" *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1770 (TTAB 2013) (quoting *Bose*, 91 USPQ2d at 1942), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014).

Applicant's sole member, Mr. Son, testified that he had no prior experience filing a trademark application, and was unfamiliar with the rules of practice.[58] He mistakenly assumed that "when you're applying for a mark, you're applying for the right to be able to use that mark on those products, and so that's why that list was produced."[59] When he filed the application, he intended to sell all of the identified apparel items featuring the applied-for mark.[60] His undergraduate education and his law degree do not imbue him with knowledge of trademark law, absent evidence to the contrary, and do not serve as evidence of fraudulent intent. *Embarcadero Techs., Inc. v. Delphix Corp.*, 117 USPQ2d 1518, 1522-23 (TTAB 2016) (the Harvard education and trademark experience of respondent's CEO who signed the statement of use "is not evidence, direct or indirect, of fraudulent intent, a necessary element of the fraud claim."), *cited in Daniel J. Quirk, Inc. v. Vill. Car Co.*, 120 USPQ2d 1146, 1155 (TTAB 2016).

Applicant also acted with the advice of counsel, who signed Applicant's declaration. Opposer did not depose Applicant's counsel. Opposer's assertion that "Applicant's intellectual property counsel signed the declaration on Applicant's behalf

---

[58] Son decl. ¶¶ 8-9, 62 TTABVUE 16; stipulated facts 50, 63, 57 TTABVUE 15-16.

[59] Son dep. 66:11-15, 65 TTABVUE 10.

[60] *Id.* at 106:20-107:5, 65 TTABVUE 16-17.

with full knowledge that the mark had not been used on any goods but t-shirts" is not supported by the record, which is at best inconclusive. Applicant was asked:

> Q. Well you've testified that you had only sold
> T-shirts at the time the application was filed. Was
> Mr. Steele, who represented you as IP counsel at the
> time, aware of that fact?
> [objection]
> A. Okay. I have no reason to think he wouldn't,
> But —
> Q. Okay.
> A. — I don't know what he was thinking or knew.[61]

Beyond this inconclusive testimony, "the record reveals no meaningful inquiry into the state of mind of any person who signed an application or maintenance document relating to the challenged registration. No showing of a subjective intent to deceive (an essential element of a fraud claim) arises from this record." *Harry Winston, Inc. v. Bruce Winston Gem Corp.*, 111 USPQ2d 1419, 1432 n. 69 (TTAB 2014). Acting on "advice of counsel" may not automatically immunize one from a charge of fraud; but on this record, where Applicant misunderstood the requirements for a use-based application and sought the advice of counsel, "the overly expansive description of goods, while a false statement, falls short of constituting a fraudulent statement which carries with it an actual or implied intent to deceive the USPTO." *M.C.I. Foods, Inc. v. Bunte*, 96 USPQ2d 1544, 1549 (TTAB 2010).

---

[61] *Id*. at 88:4-12, 61 TTABVUE 27.

Absent proof of the requisite intent to mislead the PTO, "even a material misrepresentation would not qualify as fraud under the Lanham Act …." *Bose*, 91 USPQ2d at 1940. Accordingly, Opposer's fraud claim fails and is dismissed.

## VI.    Failure to Function

We next address Opposer's claim that "**40-0**" is merely an informational phrase or slogan that fails to function as a trademark.[62]

"The Trademark Act is not an act to register mere words, but rather to register trademarks. Before there can be registration, there must be a trademark, and unless words have been so used they cannot qualify." *In re Vox Populi Registry Ltd.*, 2020 USPQ2d 11289, at *4 (TTAB 2020) (citing *In re Bose Corp.*, 546 F.2d 893, 192 USPQ 213, 215 (CCPA 1976)). An applicant's proposed mark must, by definition, "identify and distinguish his or her goods ... from those manufactured or sold by others and ... indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127, *quoted in In re Texas With Love, LLC*, 2020 USPQ2d 11290, at *2 (TTAB 2020). Hence, a proposed trademark is registrable only if it functions as an identifier of the source of the applicant's goods or services. *In re The Ride, LLC*, 2020 USPQ2d 39644, at *5 (TTAB 2020). "Matter that does not operate to indicate the source or origin of the identified goods or services and distinguish them from those of others does not meet the statutory definition of a trademark and may not be registered…." *In re AC Webconnecting Holding B.V.*, 2020 USPQ2d 11048, at *2-3 (TTAB 2020).

---

[62] First amended notice of opposition, 18 TTABVUE 13-14, Opposer's brief, 63 TTABVUE 12-13.

The critical inquiry in determining whether a proposed mark functions as a trademark is how the relevant public perceives the term sought to be registered. *In re Greenwood*, 2020 USPQ2d 11439, at \*2 (TTAB 2020). Because there are no limitations on the channels of trade or classes of consumers of the t-shirts identified in the application, the relevant consuming public comprises all potential purchasers of t-shirts. *In re Mayweather Promotions, LLC*, 2020 USPQ2d 11298, at \*3 (TTAB 2020). Neither party has adduced direct evidence, such as a survey or consumer testimony, concerning whether these purchasers perceive "**40-0**" as a mark or otherwise.[63] So we consider all the evidence of record, including Applicant's use and third-party use of the term, to determine how consumers are likely to perceive the term as used, both in general parlance and on the goods at issue. *In re Team Jesus LLC*, 2020 USPQ2d 11489, at \*3 (TTAB 2020); *In re Wal-Mart Stores, Inc.*, 129 USPQ2d 1148, 1150 (TTAB 2019). *See generally* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1202.04(b) (Oct. 2018) (listing various sources of evidence "showing the applicant's manner of use and the manner of use by third parties.").

The evidence shows that in October 2013, after the head men's basketball coach for the University of Kentucky, John Calipari, publicly announced his desire "to coach a team that goes 40-0"—a perfect record in the NCAA,[64] —Applicant's sole member, Mr. Son, began handing out and selling T-shirts bearing the legend "**40-0**" at

---

[63] Stipulated fact 25, 57 TTABVUE 12.

[64] Stipulated facts 4, 13, 57 TTABVUE 9, 11.

University of Kentucky basketball viewing parties, and then marketing and promoting them through Applicant's website, 40and0.com, and Facebook page.[65]

Asked, "[w]hat was the message that the mark 40-0 is intended to convey to your customers?" Mr. Son testified:

A. It was intended to convey the concept of a
   perfect basketball season concluding with a national
   championship. It represents the pursuit of
   perfection. It's kind of like a holy grail.[66]
   …

Q. [S]o 40-0, at least during the
   2013-2014 basketball season, in your mind, had
   significance as to the record of a perfect or
   undefeated NCAA college basketball season?
A. Yes.[67]

Applicant's brief states that "Applicant does not (and cannot) dispute that the term '**40-0**' can signify the final record of a men's or women's NCAA basketball team that completes an undefeated season, winning the National Championship."[68] But it claims that Mr. Son meant more than that—that "40-0" is a representation of perfection. It is aspirational.[69]

This argument fails for two reasons. First, Mr. Son was asked:

Q. And is it your opinion that your 40-0 mark only
   signifies a record of a basketball team?

---

[65] Stipulated facts 45, 52-59, 57 TTABVUE 14-16; Applicant's brief, 67 TTABVUE 7.

[66] Son dep. 24:2-7, 61 TTABVUE 13, 65 TTABVUE 8.

[67] Son dep. 34:16-21, 61 TTABVUE 15.

[68] Applicant's brief, 67 TTABVUE 15.

[69] Son dep. 104:15-17, 61 TTABVUE 31, *quoted in* Applicant's brief, 67 TTABVUE 19.

A. Yes.[70]

Second, even if the term is aspirational, that is a message that Opposer and other colleges may wish to use. Opposer's head basketball coach used "40-0" in this aspirational sense:

**UK MEN'S BASKETBALL**   OCTOBER 15, 2013 2:05 PM

## UK Media Day: Cats debate possibility of 40-0 season

**HIGHLIGHTS**

John Calipari knows what he likes when he sees it. The University of Kentucky men's basketball coach is pretty sure he's going to be happy with his 2013-14 Wildcats, but more viewing is required.   [71]

---

[70] Son dep. 103:2-4, 61 TTABVUE 30.

[71] 61 TTABVUE 112; 62 TTABVUE 62.



## ☰ KENTUCKY

**KENTUCKY 2018 RECRUITS**

24 SIGNED     0 COMMITS

SEE ALL RECRUITS ›



**WILDCAT COUNTRY**

Kentucky Wildcats podcast: Catching up with 1978 national title team

# Kentucky's Calipari talking 40-0 again and going to the NBA (All-Star Game)



Kentucky coach John Calipari still has some lofty goals to accomplish in Lexington.

Donald Martinez/Getty Images



**Kyle Tucker**
@KyleTucker_AJC

Posted:

**More from: Kyle Tucker**

Kentucky basketball: No rules violations for current players or staff, school says

Kentucky-Missouri basketball: Game time, TV channel, how to watch online [February 24, 2018]

Kentucky basketball: John Calipari addresses Yahoo Sports report, potential NCAA violations

Former Bam Adebayo coach doesn't think he took money.

LEXINGTON, Ky. – John Calipari is hosting his annual fantasy camp this week for hoops enthusiasts with deep pockets. But for a Hall of Fame coach with multiple Final Fours and No. 1 picks and a national championship on the resumé, what is *his* basketball fantasy?

"Um, it's not fantasy," he said, before *going there* – again. "It's to win all 40 games sometime before I retire and then be able to go to an NBA All-Star Game and 12 of the players (half of the total) in the NBA All-Star Game have played for us. That would be – I don't call that fantasy. Fantasy means it could never happen. But those would be two things before I don't have to do anymore press conferences in front of you guys."

Calipari first talked publicly about chasing a 40-0 season on the same night he won the NCAA title in 2012. (Scroll to the very bottom of this, but it also might be fun to read the whole thing, because it's an oral history I compiled on that '11-12 team.)

"Before I leave coaching," a disheveled and sweaty (but *swaggy*) Calipari said that night outside the locker room in New Orleans, "I want to coach a team that goes 40-0. And the reason: They say it can't be done. So let's go try to do it."

[72]

---

[72] 62 TTABVUE 58.

Opposer's executive associate athletics director confirmed that "there's an aspirational use, as well as a historic one...."[73]

Applicant's website used the term in just this sense:



[74]

[73] Schlafer dep. 37:18-38:1, 61 TTABVUE 93-94.

[74] 62 TTABVUE 49.

Applicant's Facebook page followed suit, posting third-party messages that the University of Kentucky or other basketball teams could end their season with a 40-0 record:

- "Kentucky is the first team in HISTORY to go from unranked to #1. Sounds like a 40-0 season to me!!!"[75]

- "Are you BOLD enough to join 40-0? Our network of true blue believers knows this will be the first perfect season in NCAA Men's Basketball since '76."[76]

- "Asked in Dallas at the National Championship game what 40-0 still meant and I said, 'it is a goal, not a dream, and if we make the final four great, we love our Cats' while wearing my 40-0 tee shirt."[77]

- "The Baylor women's team won the NCAA title and were the first team in major college sports to go 40-0. U Conn followed that up in 2014 and went 40-0."[78]

- "With a quarter of the season in the books, the men's AP Top 25 still has 4 undefeated teams with dreams of 40-0 alive."[79]

Applicant boasts that it "heavily promotes and advertises its goods through its website and Facebook page using the **40-0** mark and/or otherwise using the term '**40-0**' to signify the source of its products."[80] It argues that the media (a local Kentucky television station) has recognized its brand:[81]

---

[75] Applicant's Facebook page, Oct. 17, 2013, 66 TTABVUE 36.

[76] *Id.* Oct. 29, 2013, 66 TTABVUE 33.

[77] *Id.* Nov. 11, 2014, 66 TTABVUE 17-18.

[78] *Id.* March 24, 2015, 66 TTABVUE 10.

[79] *Id.* Dec. 23, 2015, 66 TTABVUE 10.

[80] Applicant's brief, 67 TTABVUE 17.

[81] Applicant's brief, 67 TTABVUE 19-20.



UK fans' 40-0 T-shirt line explodes in popularity
What began as their display of wishful thinking last season has exploded in popularity this season. [82]

As we have seen, though, Applicant's use of the term on its social media sites is informational, indicating historical or aspirational perfect basketball seasons, not the source of the T-shirts. *In re Wal-Mart*, 129 USPQ2d at 1152 ("The text on Applicant's website confirms the merely informational nature of the phrase."). And the media coverage treats it that way, reporting that "What began as their display of wishful thinking last season has exploded in popularity this year."[83] The increased sales or popularity to which the media coverage refers does not prove recognition by the public of the subject slogan as a trademark. *Id.* at 1158. If a term fails to function as a source indicator, "no amount of evidence of acquired distinctiveness can overcome a failure to function refusal." *In re the Ride, LLC*, 2020 USPQ2d 39644, at *10-11.

As illustrated on Applicant's website, Applicant has screen-printed the term

---

[82] Applicant's Facebook page, 66 TTABVUE 11.

[83] *Id.*

"**40-0**" in large letters across the front of the T-shirts, and nowhere else.[84] Applicant argues that there is no per se rule that a term appearing in large font in the center front of a T-shirt cannot function as a trademark.[85] While it is true that there is no *per se* rule, the large letters on Applicant's T-shirts are a relevant consideration, *In re Lululemon Athletica Can. Inc.*, 105 USPQ2d 1684, 1689 (TTAB 2013), indicating that consumers purchase the T-shirts for the message emblazoned across the front. *See In re Mayweather*, 2020 USPQ2d 11298, at *4 ("[T]his common message is used on t-shirts as a feature such that the display itself is an important component of the product and customers purchase the product not associating it with a particular source but because of the message.") (internal punctuation omitted).

Where purchasers buy goods based on the common message they display, that message fails to function as a trademark, even if it is displayed in a conventional trademark manner. *Cf. In re Team Jesus LLC*, 2020 USPQ2d 11489, at *5 ("Thus, even though Applicant's Class 25 specimen shows its proposed mark on the shirt's outer-neck, this potentially 'non-ornamental manner [of use] that is conventional for the display of trademarks ... does not require a different result [than the failure to function refusal].'") (quoting *D.C. One Wholesaler*, 120 USPQ2d at 1716).

Applicant states that it uses the "TM" symbol on its website and Facebook pages, albeit not on its T-shirts.[86] But use of the "TM" symbol cannot transform an otherwise unregistrable designation into a registrable mark. *In re Eagle Crest Inc.*, 96 USPQ2d

---

[84] Stipulated facts 22-23, 57 TTABVUE 12; Son dep. 22:23-25, 61 TTABVUE 11.

[85] Applicant's brief, 67 TTABVUE 16.

[86] Stipulated fact 64, 57 TTABVUE 16-17, Applicant's brief, 67 TTABVUE 17.

1227, 1231 (TTAB 2010); TMEP § 1202.04. Applicant further argues that "matter which serves as part of the aesthetic ornamentation of goods, such as t-shirts or other clothing products, may be registered as a trademark for such goods if it also serves a source-indicating function."[87] The two decisions on which Applicant relies, however, involve refusals to register on the ground that the applied-for designs were ornamental and do not address merely informational marks. *In re Dimitri's Inc.*, 9 USPQ 2d 1666 (TTAB 1988) (the word SUMO displayed together with a design of two sumo wrestlers held to be merely ornamental); *In re Watkins Glen Int'l, Inc.*, 227 USPQ 727 (TTAB 1985) (a checkered flag design for various items of clothing and patches for application to clothing held to be an ornamental design, but also an indication of origin of the goods). The applied-for term here is opposed on the ground that it is merely informational, a different ground. *See In re Mayweather*, 2020 USPQ2d 11298, at *5-6.

We agree with Opposer that Applicant's proposed mark "**40-0**" is merely informational in nature, expressing support, admiration or affiliation with college basketball teams that either have achieved perfect records in a single season or aspire to do so.[88] Consumers understand such a widely used, commonplace message as conveying the ordinary concept or sentiment normally associated with it, rather than serving any source-indicating function. *E.g.*, *In re Mayweather*, 2020 USPQ2d 11298, at *1 (PAST, PRESENT, FUTURE); *In re Greenwood*, 2020 USPQ2d 11439, at *2

---

[87] Applicant's brief, 67 TTABVUE 15

[88] Opposer's brief, 63 TTABVUE 13.

(GOD BLESS THE USA); *In re Team Jesus*, 2020 USPQ2d 11489, at \*5-6 (TEAM JESUS); *see generally* TMEP § 1202.04(b).

In a markedly similar case, where an applicant sought registration of **#MAGICNUMBER108** in standard characters for T-shirts and other shirts, the Board found that "due to the widespread use of #MAGICNUMBER108 to express affiliation for the Chicago Cubs baseball team and **their pursuit of** a 2016 World Series win 108 years after their last one, Applicant's proposed mark would not be perceived as identifying a particular source of goods." *In re DePorter*, 129 USPQ2d 1298, 1304-05 (TTAB 2019) (emphasis added). The Board accordingly affirmed the refusal to register the mark because it was merely informational.

As the Board noted, "The more commonly a [term or expression] is used, the less likely that the public will use it to identify only one source and the less likely that it will be recognized by purchasers as a trademark." *Id.* at 1299; *see also In re Ocean Tech., Inc.*, 2019 USPQ2d 450686, \*3 (TTAB 2019). In this case, Applicant argues that there is no evidence that "**40-0**" is a widespread, popularly used phrase.[89] The evidence is to the contrary. As Opposer's executive associate athletics director testified: "It is common on fan websites or radio shows to talk about whether or not this would be a 40-0 team prior to the start of a season."[90] He continued: "I had certainly seen the Baylor and UConn 40 and 0 perfect record T-shirts."[91] Those

---

[89] Applicant's brief, 67 TTABVUE 15.

[90] Schlafer dep. 20:12-14, 61 TTABVUE 78.

[91] Schlafer dep. 29:2-3, 61 TTABVUE 87.

women's basketball teams celebrated their wins with "40-0" T-shirts or other fan

gear:

**EXHIBIT D**



(Baylor University 40-0)



(Baylor University 31-0)



(University of Connecticut 40-0)



(University of Connecticut 40-0)

That informational message is consistent with Applicant's own use on its website

and Facebook pages. *See In re DePorter*, 129 USPQ2d at 1305. Its Twitter feed also

---

[92] 62 TTABVUE 105.

uses the hashtags "#40and0" and "#40-0." In numerous posts, third parties use "40-0" in precisely this informational sense. For example:

- "I vote for Kentucky #40and0 to win it all!"

- "Another shot at 40-…never mind. I'm not going to say it."

- "…I still got Kentucky completing the perfect season."[93]

"Where a hashtag is used as part of an online social media search term, it generally serves no source-indicating function…." *Id.* at 1302-03.

The preponderance of evidence thus shows widespread, common use of "40-0" in an informational manner to convey a perfect, undefeated NCAA basketball season. Applicant cannot appropriate the term exclusively to itself, denying the competing colleges, as well as their fans, the right to use it freely. "[I]t is the type of expression that should remain free for all to use." *In re Eagle Crest Inc.*, 96 USPQ2d at 1230. It therefore fails to function as a trademark.[94]

## VII.    Decision

Applicant's motion to amend its identification of goods is granted, and judgment on Opposer's nonuse claim is entered against Applicant as to the deleted goods.

The opposition to registration of the proposed mark **40-0** in Class 25 of Application Serial No. 86534269 is dismissed on the ground of fraud, but sustained on the ground that it is merely informational and therefore fails to function as a trademark under

---

[93] Opposer's third notice of reliance, 62 TTABVUE 85, 88, 94.

[94] Even though Applicant has deleted all goods other than T-shirts from its identification of goods, our finding that its proposed mark fails to function as a trademark applies to all of the apparel items it originally identified.

Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§ 1051-1052 and 1127, and registration to Applicant is refused.